FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAR 31 PM 4: 13
U.S. DISTRICT COURT
N.D. OF ALABAMA

NORMAN DIXON, )
)
    Plaintiff, )
)
vs. ) CIVIL ACTION NUMBER
)
SAFELITE GLASS CORPORATION, ) 91-C-1750-S
and HOWARD FRANCIS, )
)
    Defendants. )

ENTERED
APR 1 1999

**MEMORANDUM OF OPINION**

    This case raises two issues: (1) whether the plaintiff Norman Dixon was discharged by the defendants Safelite Glass Corporation ("Safelite") and Warehouse Manager Howard Francis in retaliation for his prior race discrimination action in this court,[1] and (2) whether the plaintiff's discharge violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Based on the evidence adduced at trial, the court finds that the plaintiff has so abundantly carried his burden of proof on the first claim that it is unnecessary to address the second.

---

[1] The court has jurisdiction under both 42 U.S.C. § 2000e *et* seq. ("Title VII") and 42 U.S.C. § 1981. The individual defendant is sued only under the latter statute.

I.

The plaintiff, a black American, initially filed this action on July 29, 1991, alleging a racially discriminatory discharge and denial of promotion. The case proceeded to trial. Based on the evidence, and noting that defendant Howard Francis' testimony was unbelievable, the court found that the plaintiff had been discharged because of his race.[2] On September 30, 1992, the court entered a Final Judgment, ordering that the plaintiff be reinstated to his former position as assistant manager and that he be awarded $30,801.14 as backpay and prejudgment interest.[3] The plaintiff was also awarded attorney's fees in the amount of $80,000.00. The judgment was satisfied by Safelite on February 16, 1993.

Safelite's job description for assistant warehouse manager is fairly specific:

    Purpose of
    Position        In accordance with company prescribed policies and procedures assists in the management of

---

[2] The court found that the plaintiff had not carried his burden of proof on his promotion claim.

[3] Through oversight, the court neglected to enjoin future retaliation against the plaintiff.

2

        warehouse functions for the attainment of company sales and profit goals. Supervises and trains a work force to distribute company products efficiently and effectively to both retail and wholesale customers.

| | | |
|---|---|---|
| Essential Functions | 1. | Supervises warehouse personnel in the areas of their assigned responsibilities.... |
| | 2. | Responsible for accurately receiving all incoming automotive glass, accessories, supplies, and stocking them in their proper location. |
| | 3. | Organizes and prepares the delivery schedule.... |
| | 4. | Responsible for accurately picking and proper packing of all inventory items to be shipped to customers along with loading vehicles for delivery. |
| | 5. | Inspects all glass for defects and/or scratches along with cleaning before shipping. |
| | 6. | Operates and trains warehouse personnel on all warehouse operations.... |
| | 7. | Performs office procedures.... |
| | 8. | Operates SAFELITE vehicles in order to deliver company products. |

...

Travel Requirements    25-50%

Other    Must have a thorough knowledge of WTS functions and operations. Position may require standing for extended periods of time.

Plaintiff Exhibit ("PX") 10.

3

Upon the plaintiff's return to work in November 1992, Francis required him to complete a job application, just as if he were a new employee. PX 6. He then gave to the plaintiff a "Return to Work Outline." PX 9. The outline requires that the plaintiff learn the WTS computer system. Further, the outline specifies:

> 3. Tuesday, 11/17/92, I want you to ride with the driver who runs the north run (Huntsville-Florence) area. Your scheduled departure time is 0630 and return to the warehouse at 1200. *This is a 5.5 hour run* — Tuesday through Friday.
> 4. After your WTS training, *this run will be one of your regular duties*. Upon your return to the warehouse each day, you will work in the office from one to two hours. Duties will be: filing, taking retail and wholesale orders for the night runs, quoting prices to wholesale customers; cutting, picking, and stocking tickets. Also, closing out the day business. Again, here I must insist you know the WTS system.

*Id.* (emphasis added).

The plaintiff was not given a choice in the matter - he was required by Francis to take the truckdriver job.

Notwithstanding his incredible testimony to the contrary, Francis knew that the plaintiff had problems with his left eye. In fact, all of the employees at the Birmingham Warehouse knew of

4

these problems. For throughout his shift over the years of his employment at Safelite, the plaintiff constantly wiped his left eye; the eye excessively watered all the time, and everyone at the warehouse knew it. And if that were not enough, the plaintiff indicated on his November 16, 1992, medical questionnaire that he had a left eye physical defect, and that he had undergone left eye surgery. PX 7.

Francis also knew of Safelite's unyielding policy that a third auto accident within a three-year period would result in discharge. DX 16.

As noted, Francis assigned the plaintiff to the most demanding truck route - the "North run". The North run traverses from Birmingham to Huntsville to Florence four days a week. The plaintiff was required to complete the run in 5 ½ hours, then perform myriad tasks on his return to the Birmingham Warehouse.[4]

When Francis imposed the 5 ½ hour limitation on the plaintiff, he knew that the run generally took 6 ½ hours. (PX 11,

---

[4] The court judicially notes that the distance from Birmingham to Huntsville is at least 90 miles; from Huntsville to Florence at least 70 miles; and from Florence to Birmingham at least 110 miles.

12, 13, 14). In fact, whenever Francis made the North run, it took him 6 ½ hours. PX 83.

After the third or fourth day of making the North run, to no avail, the plaintiff told Francis that 5 ½ hours were insufficient for the run. Francis continued to pressure him to make the run within the 5 ½ hours. Plaintiff often exceeded the speed limits in order to try to make the runs in the prescribed time. During one period of time, the plaintiff was forced to drive a truck with a broken left mirror. Only after the plaintiff was stopped by a State Trooper and thereafter refused to drive the truck was it sent out for repair. The usual problems with the plaintiff's left eye were constantly present.

Predictably, the plaintiff had three accidents on the North run within the first nine months of his return to Safelite. Each accident was directly attributable to the plaintiff's left eye problems.

The plaintiff was never adequately trained on the WTS computer. A one-day training session was made available to him; he needed much more. It was never provided.

6

Francis undermined the plaintiff's position by failing to insist that the plaintiff's directions be carried out by subordinate employees.

The plaintiff was discharged on June 14, 1993, on the ground that he had violated company policy by having a third accident within a 3-year period.

As of March 4, 1996, the plaintiff had lost $41,130.50 in backpay.

II.

It is clear that the plaintiff was never reinstated as an assistant manager, as required by the Final Judgment of September 30, 1992.  A cursory review of the job description for that position and Francis' "Norman Dixon Return To Work Outline" reveals the transparent nature of Safelite's asserted compliance with the court order.  The compelling testimony of the plaintiff leads to the conclusion that the disregard of the court order was blatant and flagrant.

The least important "essential function" of a Safelite assistant warehouse manager is that of truck driving.  On four of the plaintiff's five work days after returning to Safelite, truckdriving consumed at least 55% of his time.  And if the proper

7

amount of time had been alloted for his North runs, 65% of his time on four days of the week would have been consumed in truckdriving - in derogation of Safelite's policy that only between 25-50% of an assistant manager's time should be required for travel.

Francis effectively reassigned the plaintiff to the job of truckdriver and then imposed impossible time restrictions on him. Prior to his first discharge, the plaintiff drove principally on local runs in and around Birmingham. Court's Exhibit 1, ¶¶ 15-19. Upon his reinstatement, the plaintiff became the primary truckdriver for the Birmingham Warehouse.

It apparently did not matter to Francis that the plaintiff's left eye problem created a serious safety hazard for not just the plaintiff, but the public, Safelite property and customers as well. So long as the plaintiff was in a position which would almost certainly lead to his discharge, Francis' mission was being accomplished.

The court is fully satisfied that Francis retaliated against the plaintiff because of the filing of and victory in the first round of this case.

Under these circumstances, it would be inappropriate to order the plaintiff's reinstatement. For completely understandable reasons, the plaintiff does not wish to be reinstated. However, he is entitled to damages in lieu of reinstatement - frontpay.

Based on PX 61, the court finds and concludes that the plaintiff is entitled to frontpay in the amount of $69,042.02.

By separate order, the appropriate judgment shall be entered.

DONE this __31st__ day of March, 1999.

_____
UNITED STATES DISTRICT JUDGE
U. W. CLEMON

9